
FILED
2009 Nov-30  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

DON HINTON,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      CIVIL ACTION NO. 08-G-2205-W
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )
                                     )
                                     )

## MEMORANDUM OPINION

The plaintiff, Don Hinton, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

### STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." <u>Bloodsworth</u>, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth</u>, at 1239.

### STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f).  The Commissioner must determine in sequence:

(1)     whether the claimant is currently employed;

(2)     whether he has a severe impairment;

(3)     whether his impairment meets or equals one listed by the Secretary;

(4)     whether the claimant can perform his past work; and

(5)     whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).  The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers.  Id.

In the instant case,  ALJ Charles L. Brower determined the plaintiff met the first two tests, but concluded that while the plaintiff's mild mental retardation is "severe," it did not meet or medically equal a listed impairment.  [R. 12-15].   The ALJ found the plaintiff able to perform his past relevant work as a laborer.  [R. 19].

## DISCUSSION

The plaintiff alleges he is disabled due to mental retardation based upon Listings 12.05B and 12.05C.  Listing 12.05B requires the plaintiff to have a "valid verbal, performance, or full scale IQ of 59 or less."  Listing 12.05C requires that the claimant have "A valid verbal, performance, or full-scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function."  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993)(quoting Listing 12.05C). When considering whether the plaintiff has a physical or mental impairment imposing

3

significant work-related limitation of function in addition to a low verbal scale I.Q., the

Commissioner must consider the plaintiff's impairments in combination.  Davis 985 F.2d

at 533.  The issue of what constitutes "a physical or other mental impairment imposing

additional and significant work-related limitation of function" was addressed in Edwards

by Edwards v. Heckler:

> An impairment imposes significant limitations when its effect on a
> claimant's ability to perform "basic work activities" is more than slight or
> minimal.  The question under Listing 12.05C, however, is not whether the
> impairment is in and of itself disabling, thus, "significant" requires
> something less than severe within the meaning of § 404.1520(c) [of the
> Commissioner's Regulations]..

755 F.2d 1513, 1515 (11th Cir. 1985)(considering whether the presence of chronic

obstructive lung disease and exercise induced asthma provided a sufficient additional

impairment to meet the second prong of Listing 12.05C.).  The second part of the Listing,

therefore, imposes a less stringent requirement than that imposed by 20 C.F.R.

§ 404.1520(c).  Section 404.1520 sets forth the five-step sequential process by which a

claimant's disability is evaluated.  Section 404.1520(c) defines "severe impairment" to

require that the impairment or combination of impairments significantly limit the

claimant's physical or mental ability to do basic work activities.

In addition to a valid I.Q. score meeting the requirements of Listing 12.05, a

plaintiff must also satisfy the diagnostic description in the introductory paragraph of

Listing 12.05.  Listing 12.00A ("If your impairment satisfies the diagnostic description in

the introductory paragraph and any one of the four sets of criteria, we will find that your

impairment meets the listing.")  The introductory paragraph to Listing 12.05 is as follows:

> Mental retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22.  The
> required level of severity for this disorder is met when the requirements in
> A, B, C, or D are satisfied.

Therefore, a claimant must have manifested "significantly subaverage general intellectual

functioning with deficits in adaptive functioning" prior to the age of 22 in order to meet

Listing 12.05C.  In this circuit, it is presumed that a persons I.Q. remains fairly constant

throughout her life and a valid I.Q. test meeting the Listing criteria creates a rebuttable

presumption that the condition manifested itself before age twenty-two.  Hodges v.

Barnhart, 276 F.3d 1265, 1268-69  (11th Cir. 2001).  The Hodges, court recognized that

although this circuit had not formally recognized this presumption, it had been implicitly

recognized in Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992), that when a

claimant presents a valid I.Q. score meeting the Listing criteria, she is presumptively

disabled under the Listing if the other requirements of the Listing have been met.

Hodges, 276 F.3d at 1269.

        The language of 12.05 closely tracks the DSM-IV-TR definition of mental

retardation.  The phrase "significantly subaverage general intellectual functioning" is also

used in the DSM definition of Mental Retardation.  The DSM states that "general

intellectual functioning" is defined by the intelligence quotient (IQ or IQ equivalent)."

DSM-IV-TR at 41.  The DSM also defines "significantly subaverage intellectual functioning."  "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below . . . ."  DSM-IV-TR at 41  Therefore, a valid IQ score of 70 or below satisfies the first requirement of the diagnostic description.

The second requirement of the diagnostic description of Listing 12.05 is the presence of "deficits in adaptive functioning."  This also is a requirement of the DSM: "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  DSM-IV-TR at 42.

The DSM offers guidance in determining whether the diagnostic description of Listing 12.05 has been met.  The DSM defines mild mental retardation as an I.Q in the range of 50-55 to approximately 70.  The DSM description of Mild mental retardation contains the following:

> By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR at 43.

The plaintiff was born in 1968 and was 39 years old at the time of the ALJ decision.  The plaintiff was enrolled in special education classes in school, and was classified as educable mentally retarded.  [R. 119].  There are three intelligence test

6

reports in the record.  Pickens County Board of Education records include a psychological

evaluation and the results of a Wechsler Intelligence Scale for Children – Revised

(WISC-R) administered on August 28, 1984, when the plaintiff was 16 years old.  [R.

121-122].  This testing resulted in the following I.Q. scores:

| Verbal | Performance | Full Scale |
|--------|-------------|------------|
| 60 | 68 | 61 |

[R. 121].   The examiner for this test concluded that "[t]his I.Q. score places the subject in

the "Mentally Deficient" range of intellectual functioning and at the 2.2 percentile."

[Id.](emphasis supplied)

On March 22, 2005, at the behest of the Commissioner, the plaintiff

underwent a Wechsler Adult Intelligence Scale – Third Edition (WAIS-III).  [R. 138-

143].  During this test, the plaintiff obtained the following I.Q. scores:

| Verbal | Performance | Full Scale |
|--------|-------------|------------|
| 56 | 56 | 52 |

[R. 138].  The consulting examiner, Jerry L. Hart, Ph.D., stated, "It is believed to be a low

estimate as he was reporting a significant amount of pain during the session."[1]  [R. 139].

Finally, on December 30, 2006, the plaintiff was administered an additional

Wechsler Adult Intelligence Scale (WAIS) at the request of his attorney.  [R. 200-202].

The plaintiff obtained the following I.Q. scores:

---

[1]  Dr. Hart noted, "He walked with the assistance of a cane.  He rated his pain level
as an 'eight' on a zero-to-ten pain scale.  This pain was located in his 'left foot', which is
[the] one he noted had 'a trailer fell on my foot'."  [R. 138].

| Verbal | Performance | Full Scale |
|:------:|:-----------:|:----------:|
| 61 | 61 | 58 |

[R. 200].  The consulting examiner, Ben P. Curry, Jr., Ed.D., stated:

> He had no difficulties with the testing session and rapport was easily
> established.  Information from Mr. Hinton was easily obtained.  It is felt
> that there were no problems encountered and that his performance is
> optimal.  He responded appropriately and gave his answers with a diligent
> effort.  His voice is soft and he had to be asked to speak up occasionally.
> There were no visual problems or sensory hearing problems exhibited.
> Activity level was generally slow and lethargic.  There was no evidence of
> psychiatric disturbance as his mental status was judged to be appropriate.
> There was no evidence of a thought disorder and no history was given of
> such previous treatment.
>
> The Full Scale IQ score places the subject in the "Mentally Deficient" range
> of intellectual functioning.  This level of functioning is in the mild Mental
> Retardation Range.  This places him at the 2.2 percentile.

[Id.](emphasis added)

The ALJ found the plaintiff had "has the following 'severe' medically

determinable impairment:  Mild Mental Retardation." [R. 12].   However, he concluded

the plaintiff did not satisfy the diagnostic description of Listing 12.05B.  The ALJ found,

"Although the record shows IQ scores of 59 or less, the record includes no evidence of

significant deficits in adaptive functioning."[2]  Substantial evidence does not support the

---

[2]  ALJ Brower stated:
My finding regarding Claimant's mental RFC is based very simply upon
Claimant's work history.  Although record evidence makes clear that his IQ
scores fall within the range of Mild Mental Retardation, the record makes
equally clear that despite intellectual deficits, he has had a long and
successful work history.

(continued...)

Commissioner's finding that the plaintiff does not meet the diagnostic description of Listing 12.05B.  The record indicates that was in special education classes while he was in school, and it establishes without doubt the presence of significant deficits prior to the age of 22.  Additionally, Dr. Curry stated that it was his opinion that the plaintiff "is intellectually challenged.  He is functioning optimally at a very low level as evidenced by his percentile scores."  [R. 201].  Moreover, Dr. Curry opined that the testing performed by him "certainly parallels the tests that have been administered years ago."  [Id.]. For Dr. Curry to have made a diagnosis of mild mental retardation, he must have already considered deficits in adaptive functioning.  The Diagnostic and Statistical Manual of

---

[2] (...continued)
Moreover, Claimant has reported that he has no problems getting along with other people (Exhibit 4E) and that his daily activities include caring for his personal needs, performing household chores, watching TV, listening to the radio, visiting family and friends weekly, and attending church.  In December 2006, he reported to a consulting psychologist (Exhibit 8F) that he was able to acquire a driver's license by taking an oral exam, and that his past work required him to take care of farm animals, drive a truck, and operate farm equipment.

[R. 17].  However, consulting examiner Dr. Curry observed:

> He lives with his mother since finishing high school.  He is very limited in terms of comprehension and common knowledge.  For example, he does not know who the governor is for the state of Alabama or his own address.  He can not give correct change.  He did not know how much change he would get back from a ten dollar bill if he bought six dollars worth of gasoline.

[R. 201].  Moreover, his Work History Report and Physical Activities Questionnaire submitted to the Disability Determination Service were completed by his friend.  [R. 79-100].  This shows that the plaintiff had significant limitations in communication and functional academic skills.  DSM-IV-TR 41 and 49.  Adaptation to heavy physical labor does not equal adaptation in communication and functional academic skills.

Mental Disorders (Fourth Ed.) states that "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." DSM-IV at 40.

The requirement of a severe impairment has clearly been met. Plaintiff has taken three sets of IQ tests over a period of several years and has consistently had scores that clearly show mental retardation. He was educated as a mentally retarded child and ultimately received a special education diploma. The school system put him in special education classes early on and kept him there without ever finding evidence that the diagnosis of mental retardation based on IQ scores was not valid. The ALJ ignored this history in his decision-making. An ALJ must consider evidence favorable as well as unfavorable to the plaintiff. See Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986), citing Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

The ALJ failed to consider two of the three sets of IQ scores. These two sets strongly support the plaintiff's application. One set was "believed" by the test giver as possibly invalid because plaintiff complained of pain. Plaintiff did not complain that his pain from his injured foot affected his test taking. The test giver jumped, not to a conclusion, but to a "belief" that his pain may have affected his scores. This is speculation at best, and not substantial evidence. There was nothing in the way of substantial evidence showing any inconsistencies among the three sets of test scores. Plainly, a fair consideration of all the real evidence devoid of mere speculation shows all three sets of test scores to be fully consistent, one with the others. Therefore, no

substantial evidence against the plaintiff's claim exists.  Thus the plaintiff meets Listing 12.05B and is disabled within the meaning of the Social Security Act.

The plaintiff also claims disability under 12.05C[3].  Having already found the plaintiff to be disabled under 12.05B, it is unnecessary for the court to consider this issue further.  But if the court did consider the plaintiff's disability under 12.05C, the plaintiff's foot pain and injury would be an additional impairment that would meet the requirements of 12.05C.

An appropriate order will be entered contemporaneously herewith.

DONE and ORDERED 30 November 2009.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

---

[3]  In his brief, the Plaintiff:

submits that his IQ scores paired with his continued foot pain should result in a finding under 12.05C.  This however, is in this appeal a weaker argument based on the fact that the ALJ did not allow Plaintiff the opportunity to present testimony as to his impairment level.  In addition, there was no opinion evidence from a treating or examining physician in the record to support or negate any impairment level to satisfy the second prong of 12.05C, requiring an additional and significant work-related limitation of function.  Under Social Security Statutes and Regulations, the ALJ had it within his power to order a consultative evaluation on this question, but chose not to do so.  He also chose to evaluate Plaintiff's claim without the aid of a vocational expert (VE) although the Department paid for a vocational expert to be present at hearing, she was present at hearing, and her opinion remained unsolicited by either the ALJ or counsel.

[Pl's brief at 8-9].